oral argument not to exceed 15 minutes per side, or 30 minutes per side, excuse me. Mr. Fisher for the appellant. Good afternoon, your honors. I'd like to reserve seven minutes for rebuttal. With the court's permission, I'd like to focus my argument on the first two points in our brief.  I'd like to flip the order. So I'd like to begin with point two, the district court's preclusion of the defense expert testimony on future dangerousness. And then move on to point one, the district court's refusal to question the foreperson about the effects of her exposure to potentially prejudicial outside influences on the eve of the sentencing hearing. You almost have to take up two and seven at the same time, don't you? I don't know if I do, your honor. I'm happy to answer questions about it. But seven is just the legal insufficiency about that same aggravating factor. I can try to touch on that if your honor would like. So to begin with the point two, the future danger point, and we have argued that the precluded evidence was admissible both as rebuttal and as mitigation. I'd like to focus my argument on the rebuttal part of it because I think that's a little bit simpler and easier. Although I think both are substantial. And I think the first thing before I get into the evidence is to just briefly lay out sort of the legal context for this claim because I think it's pretty compellingly in our favor. First of all, there has never been a federal death penalty case in the modern era in which the government was relying on future dangerousness where this kind of evidence was excluded. We've had the federal death penalty for 25 years. We've had over 200 federal death penalty trials. This kind of evidence is routinely admitted by both sides, not just by the defendant but by the government. So that's the first part of the legal context. The second part is this is an area the Supreme Court has repeatedly addressed, the issue of future dangerousness. And there are two themes in those opinions. The first theme, which starts back with the Jurek decision in 1976 when the court approved future dangerousness as an aggravating factor, is we're going to let this go forward, but it's really important that both sides, the defense included, gets to present their evidence. The court emphasizes that in Jurek in 76 and then in Barefoot in 83. And the court then follows through on that promise in a series of, by my count, five cases. They grant relief because defendants were precluded in one way or the other from presenting rebuttal evidence on future dangerousness. And we discussed those cases in our brief. The last part of the legal context is that there are two other circuits, the 7th in Johnson and the 11th in Troya, that have said this very kind of evidence, indeed from one of these experts, is admissible as rebuttal. Both of them said that. And the 11th circuit said it was admissible as mitigation. And so to hold otherwise really on the law would create a circuit split. So what was- There was evidence admitted, though, right? Excuse me, Your Honor? There was evidence admitted on this that- There was some testimony by Mr. Aiken that he was able to get in front of the jury. But the court, through repeated comments to the jury, and I think that's important, I'd be happy to discuss that, really just completely negated that testimony. So what happened is the court hears a proffer from Mr. Aiken, makes a ruling. The only thing Mr. Aiken can testify about is that the security where Taylor would go would be different than the Hamilton County Jail. That's it. Nothing else can come in. So Aiken takes the stand. And on direct, the defense elicits some testimony that goes beyond the judge's ruling about security conditions. The judge, sua sponte, cuts them off, says, you've gone beyond the parameters of what I ruled already. And there proceeds to be a sort of an extended colloquy where the judge over and over again says several things. First of all, he says, and he addresses the jury, ladies and gentlemen, this isn't just between the judge and the lawyers. He says, I've heard, I've listened to this witness, and I've made a ruling. He says, this witness can't know where Mr. Taylor is going to go or what the security conditions are going to be like. The judge says, the testimony you've heard from him that he gave is irrelevant. Judge says irrelevant. He says, the only thing this witness can know, and the only thing this witness can testify to, is that he will go to a facility that has better security than the Hamilton County Jail. And any further questions beyond that are going to be sustained. So was the error here, in your estimation, in upholding the objection, or was it in the comments that he made in connection with that in the presence of the jury, or was it both? I think his comments to the jury were simply enforcing his original ruling, that the only thing Aiken could testify to was that the security in the Hamilton County, in federal prison, would be better. I don't think the judge made any additional errors. I think the judge was enforcing his ruling. When the defense went beyond that... But usually you don't speak to the jury in connection with making a ruling on admissibility of evidence. The lawyer makes an objection, you rule. Well, but here the lawyers tried to go beyond the judge's ruling. They tried to get in some evidence that went beyond the judge's ruling, and the judge slapped them down. You're relying on the ruling, and you're also saying, and don't say it didn't matter because he happened to get a few things in, because the judge made it very clear that the jury couldn't consider those things. Exactly, Your Honor, and I think what the other part of the picture here is, after Aiken leaves the stand, so Aiken gets in a little bit of the testimony that the defense wanted, a small part of it, on direct and redirect. Then Cunningham takes the stand. He's the next witness, and the same thing starts. When they qualify Cunningham as an expert on future dangerousness, the government gets him and says, Judge, when he gets into that area, we're going to have a relevancy objection. Cunningham testifies about other matters, not about dangerousness, about childhood mitigation, what the effects of Mr. Taylor's childhood were on him. Then when Cunningham, when they start asking questions about dangerousness, objection sustained, objection sustained, objection sustained, and the defense says, We want to make an offer of proof. The judge turns to the jury and says, Ladies and gentlemen, I'm going to hear from Mr. Cunningham, and I'll decide whether he has anything relevant to say on this subject. They have a proffer. Judge says, Can't testify at all about dangerousness. Next day, they come into court in the morning, and the judge has apparently circulated an order or a draft of an order that defense counsel hasn't fully had time to read, but they want to talk about it, and they say, Judge, can we excuse the jury? The judge plows forward. So what the jury hears at that point is the judge again saying, I think five or six times, This type of testimony is irrelevant. The defense says, Wait a second, Judge. We have these experts who can address future dangerousness. The judge says, It's irrelevant, it's irrelevant, it's irrelevant. The last thing the judge says before Cunningham takes the stand for Cross is to both sides, Don't get into the BOP. I don't want to hear anything about the BOP. Then you get to summations. Neither the defense nor the prosecutor mentions Cunningham's name. The only thing in the defense summation on future dangerousness you could possibly say has anything to do with what Aiken said to the jury was the defense attorney says there will be a gun between him and society. Then the jury gets a verdict sheet with mitigating factors on it, and there's a section that says adaptation to prison, and it lists things that the judge admitted, like that he had a GED and he took religious classes, no mention of Aiken. So when you look at the whole picture, you have, from the jury's perspective, the judge telling them over and over again, I've ruled, this is irrelevant, this witness can't know any of these things about security conditions, and the only thing he can say is that the security will be better. He says that over and over. They don't hear anything from Why is it irrelevant in the judge's mind? Well, I think it's because of two legal errors the judge makes. The first time you see these are in the order that's filed on October 15th, which is actually the day after summations. The judge says two things. He says, I'm not going to allow you to rebut personal dangerousness, the idea that Mr. Taylor is going to hurt someone himself, and I don't think your evidence qualifies to rebut, I guess, what I would call vicarious dangerousness, that he's going to communicate with other people or recruit them. And each of these rulings is based on a legal error. Let me take them one at a time. The first one, why does the judge say he's not allowed to rebut personal dangerousness? The judge says, well, you don't get to rebut allegations, and I'm not personally convinced by the evidence I heard that Mr. Taylor would be a personal danger, so you don't get to rebut that. That's clearly legally erroneous. It's erroneous under the Supreme Court's decision in Kelly. Nobody said I'm not convinced. I think if you look at that order, he says, I don't believe the evidence persuades me that he's a future danger in a personal way. He says specifically, you don't get to rebut the government's allegations. If the government's allegations aren't supported by sufficient evidence, the jury will ignore them. That's just not the law in rebuttal, Your Honor. It's not the law based on this court's well-established rebuttal cases. It's not the law under Kelly. And here the government clearly presented, the law is actually the government doesn't even need to allege something to be able for defense to rebut. Did the court instruct the jury that it may not consider whether he will be personally dangerous in the future? Absolutely not, Your Honor. The court gave a completely open-ended instruction on future dangerousness, and this was discussed at the charge conference. The government came into the charge conference, and the judge's draft charge had some examples of evidence of future dangerousness. And the government said several things. It said, Judge, we want you to add a kind of catch-all category to that, that Mr. Taylor failed to obey social norms or failed to adapt to social norms. The judge said okay over defense objection. The government said, Judge, we want you to be clear that the examples you're giving in the charge are only illustrative. The judge said that will be clear to the jury. And the third thing is the government said, we want to be able to argue things that are not as part of your examples, Judge. And the judge said, go ahead and do that. So what the jury is left with through the judge's instruction imposes absolutely no limit on what they can consider as far as future dangerousness. And the government argues personal dangerousness, all the evidence of personal dangerousness that Taylor shot. When people come, I'm asking a question about the meaning of dangerous. When a prisoner arrives at a prison, he or she is evaluated for dangerousness, right? Yes, sir. And how much, where they're going to be put, how they're going to be housed, what kind of guard is going to be put on them, what level of prison is geared on the basis of their dangerous. If they put them in one prison versus another prison, does that dangerousness change? Well, in this case, Your Honor, the evidence that was precluded. I'm asking about the meaning of the word, not about what happened in this case. Well, I think the dangerousness changes depending, it's based in part on things about the defendant individually, and it's based in part on the context, where the defendant is going to be. So if you have a really dangerous person, then you just lock him up in chains, then he's no longer dangerous because he's thoroughly locked up? I mean, you put chains around his arms and legs and never let him go? Not that you would do that, but if you did that, doesn't that sort of fight against the meaning of the word dangerous, to say he's not dangerous? The whole reason he's locked up, in this brutal way of my hypothetical, is because he's extremely dangerous, is kind of the meaning that you would normally give to the word. I'm wondering if that's driving the judge's ruling that all of this about how secure the prisons are is not really relevant. Do you see what I'm asking? Well, I think that is part of what drove the judge on the mitigation aspect of it. But I think on rebuttal, the judge didn't rely on that, I think, for good reason. What's the difference there? I'm not following. Well, I think the difference there, there are a couple of things. One is, the Supreme Court's decision in Simmons says that you have to look not just at the defendant as an individual, but the context. So in Simmons, the evidence that was precluded was that he would be serving life without parole rather than life with parole. But the other thing I think the Court's missing is, what was the government's case on dangerousness here? The government's case wasn't just, let's look at Taylor, let's look at his inner being. It was, let's look at all the dangerous, violent things he was able to do in the jail. But those are things that he did. That's true, Your Honor. You would say, well, he's dangerous because he has a tendency to do this kind of thing. That fits with the idea that dangerousness is a characteristic of a person, not necessarily a prediction about whether he will actually be successful in carrying out the danger or manifesting the danger. But I think whether he'll actually be successful, Your Honor, is the issue everyone wants to know. It's what a non-capital sentencing court wants to know. I'm not sure. Why is that? Well, because I think the ultimate question the jury has isn't a metaphysical one about his personality or inner being. It's, if we give him life, are we going to have to pick up the paper and read that some prisoner or some guard was killed? And that's the way the government presented it, Your Honor. I think that's the critical piece. The government, I think one line captures the theme of the government's argument. They said, prison walls cannot contain or deter him. So the government was keyed into the very thing the jury was keyed into, which any reasonable person or juror would be keyed into, which is, at the end of the day, what's going to happen? Is he going to hurt people? Some reasonable jurors might be keyed into whether this is the type of person who's going to commit these crimes in the future if he gets a chance. I think that's true. That's a meaning of dangerous. And I think that's true, Your Honor. That might go to culpability and the value of the person and so forth and would go down to zero if you locked him up in the prisoner in the iron mask or something like that where he's totally incapacitated. Most people would not say, oh, that person's not dangerous. They'd say, the reason he's there is because he's dangerous. And I think in a hypothetical situation where someone was locked in an iron mask or dropped on a desert island, it would all be about context, not the individual. But here it's a mix, and that's why the government paid so much attention to this. So you're saying which cases – is there a case that is exactly on point where somebody wanted to introduce evidence about the type of security that they would have where the person would be serving the sentence, the court said, no, you can't, it's not relevant because we're looking at the person, not the context, and the Supreme Court said no? I think there's not a Supreme Court case directly on point, but obviously we're not in a habeas situation. Right, I understand that. Troyer, the 11th Circuit case, is I think as close as you get. But again, I think the important thing is it's not just here are the security conditions. These are experts who looked at Mr. Taylor as an individual. Mr. Aiken had his jail records, toured the jail, relied on his height, his weight, his build, his facial features, his education, knew about the facts of the crime, his lack of a gang affiliation. So this isn't just, hey, here's what prison is like. This was individualized to Mr. Taylor, and the testimony was individualized to the very threats that the government was relying on. So they were addressing is he an escape risk, is he going to manipulate other inmates? So this was really quite individualized to Mr. Taylor. If the court has no further questions on this point, I'd like to move on to the four-person issue. This court's case law is quite well established. The rule is very simple, and it's an easy one for district judges to follow. And the rule is this. When a juror in the middle of a trial is exposed to a potentially prejudicial influence, the defendant has to be given an opportunity to prove actual bias, and therefore the court has to actually ask the juror about bias. In other words, has to ask the juror about what effect, if any, the exposure had. And this court has numerous cases on this issue, and they line up in two groups. One is the court asked that question, and it was affirmed. And there are a number of other cases where the court didn't ask that question, and this court grants relief. Now, the government talks a lot about discretion. And we don't deny that a district judge has great discretion in this area. He or she has discretion over how to phrase the questions about effect. And once the juror answers those questions, the district judge has a great deal of discretion to evaluate those answers, to look at demeanor, to weigh conflicting or unclear responses. The problem with that is you never get to that in this case, because the judge never asked any kind of question about the effect of the exposure. Here you've got a juror who tells the judge she's been exposed to, first of all, two other people who have told her that the defendant has accused the jury of being rednecks. And she assumes that the accusation came from the defendant or his friends. I thought that there is a transcript of what she told the judge, right? Yes, Your Honor. She says that she's—someone says to her, I didn't know you were a redneck or something like that. Yes. And then the judge says, did they tell you where the accusation came from? And she said, no, but I assumed it came from the defendant or his friends. You used the word accusation? The judge used the word accusation, Your Honor. It doesn't sound like an accusation if someone says, I hear you're a redneck. It sounds like someone joking that someone referred to you as a redneck. Well— That's what it sounds—I wasn't there. I don't know the— I understand, Your Honor. —tone of voice or something, but— The judge says, did you—this is on page ID 5247. He says—the judge says, you did not follow up on the conversations when people said they did not know you were a redneck. And the juror says, no, I obviously have speculated in your head. Then the judge says, did they tell you where that comment came from? And I misspoke. He didn't say accusation. He used the word accusation. That's correct, Your Honor, and I misspoke. He says, did they tell you where that comment came from? And the juror says, not necessarily, no, sir. I assumed it was from either the defendant or some of his friends. So she assumes that it's the defendant or his friends who have called the jurors rednecks. She also tells the judge that she's spoken to her husband about her fear of Mr. Taylor and his friends. I don't understand, but I'm thinking about the accusation that the jury is a racist or redneck. There's no indication that the foreperson knew that at the time of the inquiry by the judge knew that there was any mention of racism. Is that right? Well, the only thing is the judge later finds that the jurors all went back to the jury room and talked about it and that they all knew it was racist redneck. That's well after he made the decision. That's true. I guess I would suggest that in this context with an interracial crime and a black defendant and a white juror, the accusation of being a redneck is quite racially freighted, and I don't know that the racist adds much. So you think people in Tennessee, if you're called a redneck, means you're called a racist? I think it depends on the context, Your Honor. I think a black defendant who has been convicted by an almost all-white jury and calls the jurors rednecks, I think that's racially freighted. Yes, I do. In the cases that you alluded to where you indicated that the failure to ask a follow-up question had resulted in the case being reversed, in those instances, was there some actual evidence that that juror to whom the question was not posed was in fact biased? No, Your Honor, and that's what I think makes our case even stronger. We have indications in the colloquy with the juror that she has these influences, that the two people she spoke with and her husband have had an effect on her, and that she's so fearful of the defendant, she's talking about buying a gun to protect herself. That's in connection with having sat on a case where somebody was accused and convicted of murder. There doesn't seem to be any tie that I could see in the transcript relative to the question about somebody being a redneck. That was implicit in the whole underlying case, that this person's a dangerous person. I don't think so, Your Honor. I think the problem is the judge never asked her any questions about this. She talks about the redneck accusation, and she attributes it to the defendant and his friends. That's her word. But in your opinion, you don't have to show that she was actually biased in any event. I don't think this court— So this is really, in your opinion, structural error, then. I think it is. I don't think this court needs to reach the issue of actual bias. I think the most glaring error is the failure to question her about her defense. But how can it really be structural error if Remer is generally assessed based on an abusive discretion? Is it not? Well, I think the case law is clear that when you have a juror who has been exposed to this kind of influence and you deprive the defendant of the opportunity to establish actual bias, that's error that requires relief. You can't affirm in the face of that. And, in fact, the prosecutor thought the judge really should question. Absolutely. I think what's, to me, very interesting about this claim, and also the other claim, is this is a case where the district judge really gets out in front of the government. To the government's credit, they, along with the defense, immediately, when they get the transcript of this, they say, Wait a second, Judge, you didn't ask this juror about effects. And they hone in on it. They hone in on the conversation with the husband. And the government says, I think you should do this, Judge. I think you should go question her individually. And the other thing I think that's compelling is this would have taken five minutes. I understand. And there were alternates. Obviously. I don't know, obviously. One might speculate that he wishes he had done it. It's a big, long trial, and he may have left out the key question. What's your strongest case, and you say you have numerous of them, that requires this question? I think Walker is the strongest case, and that's a case in which the court actually asked the jurors, What were you exposed to an influence? And a couple of the jurors said yes, and the judge didn't follow up and ask about. What were they exposed to in those cases? They were exposed to, there was a, I think it was some video testimony that came in, and the actual paper copies of the, I think it was depositions, weren't supposed to go to the jury, and there was a concern about sort of a double counting of evidence. It seemed to me much less prejudicial than what we have here as far as the combined influences. Is it a fair statement, not that it ultimately matters, that this isn't a case where the judge just contumatiously said, I'm not going to ask that question? Because he asked the question of all but this one juror. So you've combed through this, and you've found one time that it was missed, and that becomes your argument here. I think that would be true, Judge, if that was all it was, if it was an oversight. But the problem is both sides highlighted it for the judge, he keyed in on it, and then refused to follow up. I understand. So that leads me to my next question. I suspect the fact that this in-camera procedure without lawyers was agreed to by the parties, in your estimation, doesn't make any difference, ultimately because once it was called to the judge's attention, at that point he had to go back and remedy the situation. That's right. If I may answer your question, I see my time is up. But that's absolutely right. It was clearly understood among the judge and the parties that the judge was going to report back. It was also clearly understood that anybody who was exposed, there were going to have to be the effects questions. The government themselves said that before, and afterwards the government said it, the defense said it, and the judge didn't say, oh, wait, it's too late. You should have come to that party. You decided not to come. This was known between the time that the individual questioning occurred, and let's assume that there was an omission there. And the group questioning when they reconvene a couple weeks later, right? Yes, Your Honor. In the meantime, these transcripts are available. This issue comes up. Yes. When the government says, gee, I think you should do that, would that have then occurred at the time that they all reconvened just prior to the commencement of the proceedings, or some other time? Well, the questioning of the juror occurs on September 23rd. Their filing is made in the next few days. They reconvene in court for the next time on October 2nd, and that's when the government twice says, I think you should do this, judge. The judge issues an order on October 3rd saying, I'm not going to do it, and then there's some more discussion on October 6th, which is when the sentencing hearing commences. So your position is there was more than enough time and opportunity to do it when the jury reconvened? Oh, absolutely. This would have taken five minutes, and worst-case scenario, if this juror was biased, there were six alternates who they could have subbed in without missing a beat. Thank you, Your Honor. In Walker, there was a request to inquire into the juror's states of mind. I'm sorry, Your Honor? In Walker, there was a request to inquire into the juror's states of mind. Is that true? Well, that was what the majority found. Judge Batchelder dissented on that issue. Here, there's no question. So we go by the majority, though, in terms of the whole thing? Yes. They said there was a request, and it was preserved that the judge didn't inquire into it. Was there a request in this case before he did the? Before he interviewed the juror? As I was trying to say to Judge McKeague. I understand that. I was looking at this. That's okay, Your Honor. It's an important issue. All right. Before the questioning, everybody agreed the judge was going to question the juror without any counsel, without the defendant, because this is an issue of fear of the defendant. And it was understood. Everybody said the judge is going to report back. The government said before the questioning, if anybody's exposed, there's going to have to be questioning about effects. So the judge goes and does this questioning. The judge understands there has to be questioning about effects because he does it with everyone else. They come back. Everybody reads the transcript, and the defense and the prosecution immediately both say, Judge, you didn't question the foreperson about effects. They didn't know it was the foreperson at that point. They said, Juror number one. And the government agrees with the defense. You should do it. And the judge at that point doesn't say, too late. You should have asked me then. You guys didn't come. He says, this isn't necessary. Would that have been because he didn't think it was sufficiently pejorative or sufficiently likely to affect the juror's decision based on his evaluation of the juror and the tenor of the response, given that it's not like you heard someone say, I saw this person do it or something? I mean, it's that some friends may have referred to the jury as rednecks. It's the most you can really get out of that colloquy. Well, in addition to the conversation with her husband. But I guess I would disagree. I'm talking about the insult. I'm not talking about her fear or whatever. I mean, we're supposed to defer generally to the judge. The judge is a very respected judge. He's thoughtful. He's trying to do a good job from all appearances. And the judge asks these questions. If the judge could have, I'm just speculating now, the judge could have wanted to do it and just inadvertently didn't do it, or the judge could have reasoned, this doesn't look like it's bad enough for me to even have to ask that question. And I'm not sure if you can tell from the transcript what it is. But it's not like they were called a racist and it's not like it's even clear that the juror has concluded that it's the defendant who said it rather than some of his people. Well, you've asked several questions. Let me try to answer them. Well, right. I'm curious about all of them. Your time is up. Would you like me to try to answer them now? Yes, right, one by one. I'll try to be brief. I think, first of all, the outside influences here are not just the two people who told her about the redneck comment, but her husband, number one. So I think that's important to note. There are multiple outside influences. Her husband told her about the redneck comment? Her husband, she said, I talked to my husband about her fear of Mr. Taylor and his friends, and she and her husband are thinking about buying a gun. So there's that influence that the judge, that, again, both sides hone in on and the judge never asks her any questions about. So I think that's important. But let me even just take the redneck part of this by itself. I think that what it communicated to the juror is that Mr. Taylor or his friends are somehow angry at the jury for their verdict. And I think in a case where future dangerousness is at issue, it's easy to see how that could make a juror fearful. Now, the juror mentions the exposure to the redneck comment, and then she segues on her own into, oh, by the way, I want to ask you, Judge. Is this fear? Is that the nature of the prejudice? I thought it was insult and anger that I could be called somebody who's not fair. I think it's both, Your Honor. And the judge said, well, this isn't really a major. I mean, different people react to language in different ways. It just seems remarkable. I thought this was bias, not fear. Well, I think the bias comes from multiple sources. One is fear. If you have a defendant who's, first of all, mad at being convicted and mad at the jury. Wouldn't you assume that most defendants are like that? I think we could speculate, Your Honor, that they might expect to be convicted. This is a case where there was pretty strong evidence on the kidnapping. Or we could expect they'd be mad at their lawyers or the judge. But here the juror hears that the defendant's mad. What troubles me about this is not so much that the juror might have been feared and needed to assure the judge that she wasn't in fear, but rather the kind of natural response you would have to someone who's insulted you. I think we're speculating. You say, well, I'll fix him. When somebody calls you an SOB, you respond. I mean, that's just sort of the kind of thing you would want to keep from a juror and make sure that the juror didn't. You're focusing on the one that seems less intuitively likely. I think the problem is we can speculate about what she might have felt. All we know is— You're trying to figure out how reasonable the judge was in making this determination. I think what was unreasonable was the judge never asked her how she felt or how this affected her. And what she said in the colloquy is, I am afraid of this defendant and his friend, so afraid that I'm talking to my husband about buying a gun. That's all we know. We can speculate about how these kinds of influences would have affected a juror or should have affected. Number one, we don't know because the judge never asked her. And I think the law is clear. The judge has to ask her that. Okay. Thank you, Your Honor. Good afternoon. May it please the Court? I'm Chris Poole from Chattanooga office, the U.S. Attorney's office. Did you try this? I was one of the attorneys who tried this, yes, sir. You didn't do it all by yourself, huh? I didn't do it all by myself. The defendant got a fair trial. I mean, that's the underlying important thing to note here. The defendant got a fair trial from an impartial jury, a competent jury, who reached a verdict that was supported by the evidence. With regard to the issues that were discussed, Judge Collier did ask, juror number one and all the other jurors, if they were affected by this and if they could put aside anything that they may have heard from media, coworkers, neighbors, or any source outside the trial in making a decision in this case. He did ask that question. At what stage? That was when we came back on October 6th in the group, when the jury was there as a group. He did ask that question to them as a group. After the individual interviews? Yes, sir. Yes, sir. There were individual interviews. Are you saying that's where he complied with Walker? Yes, sir. I'm saying there is no case. The defense cites cases saying you have to individually talk to these jurors. Corrado, I think it is, and Goins are the cases where the judge is. He says Walker is the main one. Because Walker is the strongest one. He says Walker is the strongest one. The judge in this case did, obviously, individually ask the jurors questions. There's no question that the judge individually talked to them. That case involved inadmissible evidence. Obviously, they got back to the jury, and they saw, and the judge didn't ask them about it. In this case, the judge did individually vore dire. The main distinction you have with Walker is that he did ask, albeit in a group. Or does something in Walker say it has to be an individual question? Goins and Corrado say that en masse questioning alone is not enough. Into the group questioning is not enough. But in this case, we have individualized questioning. None of these cases that they cite was their individualized questioning, and were the proper questions asked. You had them both in this case. What we don't have is Judge Collier following up with juror number one and saying, does this affect you? And he does put in the record his reasons. He says. What is the chronology? I'm sorry. I'm sorry. When did he ask the blanket question? He asked the blanket question after about a one or two week period, two weeks after the individual questioning. So there was individual questioning after the whole racist redneck thing was in the media. He brings them in one at a time. The whole point of individual questioning is that jurors may be more inclined to say things that they wouldn't say in open court in the presence of everybody else. And you don't want to pollute the rest of the jury. Yes. So I don't really understand how the group questioning can cure the earlier individual questioning mistake, if it was a mistake. So if there is authority that says there has to be individual questioning, which there is, and if that authority can be extended to say you've got to ask if they say something, you've got to ask if it's going to affect you, that just seems to make logical sense. How does that then get cured by group questioning? Yes, sir. I think obviously there was individual questioning. Judge Collier, who was the only one there with the juror, was in the best position to assess whether or not she was affected. But why would he ask it in all cases except this one? I don't know. Obviously we wish he would have asked that specific question. We asked him to ask it. And our problem is when he denied the additional request, he doesn't say why it was unnecessary with respect to this particular juror, right? What he says is unnecessary. Well, he also says that from the tenor of the conversation it was quite clear that it didn't bother her. The defense likes to tie in the conversation about buying a gun or fear in context with the media question. And Judge Collier was quite clear those were different conversations, that it was quite clear from talking to her that that was about the nature of the case. It had nothing to do with, hey, somebody said, I heard you might be a redneck. And Judge Collier did point out when the jury came back that he did not want to bring it back up individually. I believe he said to emphasize it. He thought he could tell from talking to this juror that it did not affect this juror. He thought it could only harm the defendant by emphasizing this information again, which is why he chose to bring them in as a group and do what I would call sort of the standard questions and warnings when you come back from a break, which is you've got to only listen to the law and the evidence and don't let anything else that you may have heard or someone else may have told you affect you. But he did say, I think that would only highlight something that's not a problem. He said, right now it's not a problem, and me highlighting it can't, you know, if there's not a problem, I can only make it a problem. You would have us rely upon his characterization of the tenor of the conversation to justify not asking the follow-up question. I would. That's what it comes down to. Yes, sir, I would. But I do think that is the distinction in the cases set by the defense, is there's not a case like this where there was individualized questioning and then there was, again, the proper questioning as a group. There's not one where both of those things occurred that I'm aware of, and there's certainly not one sided in any of the briefs. I don't want to foreclose anybody from asking more questions about the foreperson, but I am concerned about this issue number two because it just seems, at least arguably, fundamentally unfair that the government can advance the theory of future dangerousness and then there can be these restrictions on rebutting that particular aggravating or in this case I would think was a non-statutory factor. It just doesn't work right. Yes, sir. First of all, I'd like to point out that I disagree with the fact that they didn't get a lot of this evidence in front of the jury. And going back through the transcripts, as a matter of fact, today and looking at Mr. Aiken's testimony, if you go to page ID number 7432 through 7438, six pages of transcript, this is the redirect of Mr. Aiken in front of the jury. And he does talk about, he doesn't name the facilities. They say, without saying Ad Max in Colorado, tell us what the conditions are like in the most serious or the best, most secure prison. And he talks about how it's the most secure place on earth, in his opinion. And then they say, well, the type of places that Mr. Taylor would go to, a USP, tell us about the security there. And he goes on for six pages and he does do that. He talks about how they monitor phone calls, how they check mail, how there is always guns up between the defendant or the inmates and outside. He talks about the special housing unit. If you get into trouble, you get sent to the SHU and it's a special housing unit. He talks about what he called man barrier wire, which he differentiated from Cortina wire and said, this stuff explodes around you if you try and get out. The opposing counsel says that the judge told the jury that this was not relevant. Is that right? On direct, there was an objection. The judge at that point said, you know, he can only testify as to the differences between Hamilton County and the BOP. On redirect, which is when he got into, like I said, six pages worth of transcript of saying what all these security measures were, there was no objection. Judge Collier did not opine, did not say anything to the jury about, hey, disregard that. Hey, this guy didn't know what he was talking about. That came in and then he was excused and the next witness stepped up. So first of all, I do think that that testimony, a bulk of that testimony was presented to the jury. They did have the information about the security at the BOP. With regard to the idea that this was rebutting our, the United States' argument about future dangerousness, what Judge Collier said, and I think the record certainly backs this up, is that all along the government's theory was not that Mr. Taylor was some intimidating, physically imposing human being who was going to hurt somebody with his bare hands. I mean, clearly the jury sat there for two months or however long we were there looking at Mr. Taylor, who was 5'8", 140 pounds, had little glasses on. He was not physically imposing. What Judge Collier picked up on, and the record supports, is that all along our theory was that Mr. Taylor was a very smart guy, a very charismatic guy who could affect and could control other people and could manipulate them. And he pointed out that the proof offered by Mr. Cunningham, Dr. Cunningham, did not rebut that. The idea of the statistics in BOP are one thing, does not rebut the idea that's not going to make Mr. Taylor not have influence over any other person. And that was what we argued throughout the trial was his dangerousness. I mean, maybe it goes to the weight. I mean, you've got the fact that he will be sequestered and all alone because of his stature. Why isn't that relevant? I don't know that there was ever any testimony that he would be sequestered and all alone. No, it was proffered that because of his own vulnerability, he'll be watched 24-7. Why isn't that relevant? Why should you be able to exclude that? I don't think it rebutted what we argued. Well, of course it is. How do you manipulate people when you're being watched 24-7? There was no proof that he was not going to be able to talk to anyone or not have contact with anyone, which is what, as Judge Collier pointed out, would rebut that, that he would not have contact with any other human being was not any of the proffered proof. I think it's telling when you look at what the jury returned as far as the aggravating factors. The first non-statutory aggravating factor that we alleged was other uncharged crimes of violence, the escape attempt from Hamilton County Jail. We alleged that as a non-statutory aggravating factor. The jury did not find that that affected their decision. They did not find that the escape, and during this when we were arguing with Judge Collier, Mr. Bill Oertwein, one of the two Oertweins who represented the defendant, said we need to get this stuff in because they're talking about this escape. Well, the jury didn't find that was a factor in setting the punishment. They did not find that factor. I think that's telling. I think what's telling, we rarely, if ever, know what a juror's thinking, and we don't know what happened in that jury room. What we do know in this case, and it came about with the alternate juror who was interviewed afterwards and another juror who was interviewed in the paper, and it was put into the record at 810 page ID 2671, the other juror who was an actual juror, not an alternate, said we all thought the defendant had no remorse. We tried to have sympathy for him, but we just couldn't find it. And the no remorse was, I think, the key issue in the sentencing of this case. We introduced the proof that the defendant was making phone calls laughing about the victim and his fiancee who had testified. We introduced a letter where he's saying it's not like I killed the president. Those weren't the exact words, but that was the implication. They're acting like I killed the president. And in the charge to the jury, one of the things listed as this future dangerous with regard to the defendant was that he failed to adapt to societal norms. And I think that's what our argument was. He has shown no remorse. There's a lot of talk at the trial. There's a lot of talk in the briefs, and understandably so, that the defendant was 18 or 19. I think there was actually confusion at the time of the trial as to how old he was. This was five years later. He's 23, 24 years older. And during the trial, during the sentencing, while the victim's fiancee is testifying, he's on the phone laughing about it. I think the telling comment from the juror, and we never know exactly what they're talking about in there, but that was the best proof that you're not going to be able, even after you've been convicted of killing this person, you're laughing about it. If you can't adapt to societal norms at this point, you're always going to be a danger if you can be a danger because you don't care. But you don't get to kill somebody just because they have no remorse. So you still have to find these aggravating factors, and they have to outweigh the mitigating factors. Yes, sir. And so we're still back on did the defendant get a fair shake with respect to attempting to rebut your aggravating factor. And it seems to me you've either said that it wasn't proper rebuttal, or you've said, well, maybe it was, but he got enough of it in through what wasn't precluded. So which is it? Well, I'm sorry I was confusing about that. I think what got in could be used as proper rebuttal. I think what they are saying should have come in that didn't was not proper rebuttal. What I wanted to point out at first was that a lot of the proffered information actually did come in. So it wasn't proper rebuttal because it didn't go to his individual characteristics in the crime, or it wasn't proper rebuttal because it had already been covered anyway? It wasn't proper rebuttal because it did not rebut our argument with regard to why this defendant is dangerous. Is that why the judge thought it was irrelevant? Yes, sir. Yes, sir. As a matter of fact, he said if you were to put forth some proof that he would have no contact with anyone, he would have no contact with anyone inside the jail or outside the jail, that's the type of rebuttal proof that would be appropriate in this case, but that's not the problem. So it had to be absolute? It wasn't enough that he would be constantly supervised, that they'd be watching him? It had to be absolutely no contact? In order to contain what we argued was the danger. But that's absurd. That's absurd to say that you're saying he's going to be manipulating people. He's going to have a chance to be manipulating people. And to say that, well, you're not going to rebut that with evidence that shows that he's going to be watched, he's going to be monitored, everything he says will be heard and monitored, that's not enough. You have to show that he's going to have absolutely no contact with anyone else. Well, I disagree, Your Honor, respectfully, that anyone ever, there was any proffered testimony that everything that he said was going to be monitored, they were going to know everything that he said. They said he would be watched, and like I said, a lot of that proof came in about how you get to special housing if you mess up and how we pay attention to these people. But I don't think there was ever any proffered testimony, and I'm sure defense counsel will correct me if I'm wrong, that we're going to watch everything he says, we're going to watch everyone he talks to. Well, phone calls are going to be monitored. And that testimony came in before the jury, that phone calls could be monitored, that mail could be pulled. That testimony was presented to the jury. They had that information. And what about the testimony from Cunningham about how murderers behave in jail? It's not individualized to the defendant. I think Judge Collier pointed out that is the type of testimony that could be presented in every single defendant case, regardless of who the defendant is. As Judge Collier pointed out, that's more of an argument to Congress about Cunningham being a crime. Well, do you have a case that says that that's inadmissible? Absolutely inadmissible, no, but I don't have any case that says it's a crime. I mean, there's an implication that, you know, look, this guy is a dangerous guy. He's a murderer. He doesn't give a hoot. We do have cases from the Supreme Court, and, Your Honor, they're in our brief, that say that it has to be individualized to the defendant. I mean, that is certainly the law. So if you individualize it regarding age, does that help? Perhaps. Still, random statistics are those. They're random statistics because they are a wide range of people taken into account. Individualizing it to the defendant in this case is, in every case, an issue, and they couldn't do that. Cunningham was able to testify to a lot about this defendant. I mean, he went through the family tree, the frontal lobe development, the family indicators that led, in his opinion, to where Mr. Taylor ended up. And so there was plenty of testimony along those lines from Mr. Cunningham, who was a psychologist and, as the Court found, was an expert in the field of psychology. The Court did not find, also, that he was an expert in the field of the Bureau of Prisons. I thought the judge backed off from that and said, no, I'm not saying he's not an expert. I'm saying that it's irrelevant. I believe he said both, Judge. I believe he said both. Yes, ma'am. Well, I thought he backed off from the one that had to do with his qualifications and said, no, that's really a question for the jury. That may have been in his order, Judge. If we find that there was an error in limiting this testimony, you are also arguing, are you not, that it was harmless? Yes, sir. Would you speak to that for a minute? The reason that I'm asking you this question is, frankly, the vast majority of the death cases we see, the actions of the defendant seem to be, relatively speaking, more heinous than this one is. They're all bad. It's just a matter of degree. So if a credible argument can be made that this is not too far down the scale of the worst of the worst, then it seems to me the relevance of this testimony in terms of persuading one juror becomes more significant than if this was one of our other death cases where the facts are really, really bad instead of just bad. Do you see what I mean, sir? I understand the question, Judge. So how could we, if you agree with any part of the premise that I've just advanced, how do you suggest we are able to say that it was harmless beyond a reasonable doubt? Well, I think one thing, and I pointed this out earlier but not in response to that direct question, I think one thing that's telling is that when we say, look, he tried to get these guys to an escape and you should consider that as an aggravating factor, the juror didn't find that. I think that's one thing that's telling, and I don't know how more, they already didn't find it, so I don't know that more information on that than they already received would have changed the opinion of the jury in this case. But I think there's clearly sufficient evidence, obviously, to support that the defendant stalked for months, if not a year, this person, that he went to his house, went to his business, followed him around, burglarized him five times, then obviously kidnapped and carjacked him early that morning and drove him hours away, drove him around until they got to the rural area and shot him and could have gotten away, shot him a couple times, but then he finished him off by shooting him in the mouth before he went away. That proof, I think, was vastly more important than Bureau of Prison Statistics about what some random person might be likely to encounter. Well, that may be, but the defendant makes a pretty compelling argument that of all the death cases, future dangerousness seems to be a more weighty, motivating factor on the part of the jury than some of the other statutory and non-statutory factors. So first off, do you agree with that premise or disagree? I'm sure future dangerousness is a factor that, I mean, if I was a juror, that would be a factor that I would be concerned with. Comparing it to other cases, I don't know that we get to do that. I know they've asked in their brief for proportionality review, and they've said you're not only supposed to do proportionality review. I'm not talking about proportionality review. I'm just simply saying if that is a non-statutory factor that may have a heightened importance to jurors, then it seems to me more problematic if you are limiting the ability of the defendant to rebut the government's argument if the government chooses to make the future dangerousness argument. I understand that, Judge. Because that's your call. If you didn't make it, then okay, precluding this stuff is probably fine. But once having made it, shouldn't they be able to completely respond to it? And I guess our argument is that they did completely respond to it with the relevant evidence that they offered. I still think the trial judge gets to determine whether or not it's relevant to what they say it is relevant to, and I think Judge Collier did that in this case and said the evidence that you are offering and that you've proffered is not relevant to the argument you're making about rebutting that future dangerousness. In this context, it's certainly a unique, I think, context of how very narrow we argue that his dangerousness was, what his danger was is different than if you're comparing it to all these other death penalty cases. It's not that, hey, physically he can do this. It's that he has this power to control people and to manipulate people. And that was a very specific argument. And like I said, I do think, as you pointed out earlier, Judge, lack of remorse is not a reason enough for the death penalty. But you can consider lack of remorse when you're talking about somebody's future dangerousness because you can consider do they adapt to societal norms? Do normal things, normal rules, normal laws affect them the same way? Or are they always going to be a danger because they don't care and are not affected by societal norms or mores or anything of that nature? And I think, as I said, the comment we got from a juror about no remorse is telling because five years later he should have been remorseful and not laughing at the victim and the victim's family that was left behind. And I think that's a consideration in considering future dangerousness. I think they were able to offer the proof that could rebut our argument regarding future dangerousness. So I think the jury had before it the information it needed to reach a proper ruling, and I think the jury did that. Glad to answer any other questions. Just out of curiosity, were we to send this back on any of these claims for that matter, what do you do? You reconvene a new jury for the penalty phase and you somehow bring them up to speed on what the evidence was in the guilt phase? I suspect you would basically have to. I think that's right, Judge. I think you'd basically have to try all the proof again to get that in front of them, although I guess you would not have to find that he did that beyond a reasonable doubt. But I don't know any other way, and I have not researched that. Have there been such federal remands where they just do sentencing on remand? I'm not aware, Judge. I had the same question. Are there really any examples of any do-overs on the penalty phase, or at that point is the practice to simply go back to life without parole, which parenthetically here is what you offered this guy and he turned down? The simple answer is I don't know. I don't know if it would come back and you would have to go through a whole process of going through D.C. again with each side, and then they would ultimately make the decision. And certainly if it were tried again just on the sentencing issue, I think you would have to put in all the proof of the guilt, just because the jury would have to know what happened. I don't think as a practical matter you could hand them a transcript of two weeks and say read it. I think you'd have to put all the proof back on, but it would only be on the sentencing issue. But I don't know what other cases have shown. Thank you. Thank you, Your Honor. I'm going to try to run through a bunch of different points. Do you know the answer to that last question? I do, Your Honor. There have been quite a number of sentencing reversals, and they go back, and in some cases there's a new sentencing hearing. Federal now, I'm talking about. Yes, Your Honor. In some cases the government has the option of either having a new sentencing hearing, or the case can settle at that point. I understand, but if it doesn't settle, then have they had those new sentences? Yes, Your Honor. And do they essentially retry what happened, although not asking the jury to determine guilt? I think the government has the option of presenting the evidence that they think is necessary for the jury to appreciate the weight of the aggravating factors. So as a practical matter, if they want to present all their evidence again, they're able to. I want to jump to harmless error, and I want to say, first of all, the government didn't argue that in their brief. On which issue are we talking? On the Cunningham issue, or the other issue for that matter, and I think that's important. And I would cite to this court cases from this circuit that hold that that issue is therefore waived. Lovings v. Parker, 712F3283. It could be waived, but don't we always have the ability to affirm on other grounds if it's supported by the record? Not according to this court's case law, Your Honor. And there are other cases I'd be happy to provide the court with. But I guess the other important point is this error certainly wasn't harmless. You had a jury that was out for two days that sent back two notes saying they were divided. You had some very substantial mitigation that was found, including that the defendant was 18 at the time of the crime and had no prior convictions. And as Judge McKee, as you pointed out, future dangerousness is really the most important aggravating factor in federal death penalty cases. I didn't point that out. I said you claimed that. Well, Your Honor, the statistics show that. So when you look at the cases where people get death, 80-plus percent had future dangerousness found. And of the cases where dangerousness is found as an aggravator, 80-plus percent of those get death. So it really is quite important. I'd like to make a few other comments on the dangerousness point, about the evidence the defendant was able to get. And I think it's really just not realistic to put yourself in a juror's place and say you hear the judge say over and over and over again the things I talked about. Then a few pages of redirect testimony comes out without objection. And then, and here's something, this is what Mr. Poole ignored, the judge goes back to this during Cunningham and says the same things. And then nobody argues Aiken, and there's nothing about him on the mitigating factors form. For a juror at that point to say, well, I guess we're supposed to consider that six pages of redirect, I just think is really unrealistic. Let me ask you about that because I was going to, when you were first up, and I frankly forgot, you said earlier and just repeated that in the mitigation list there was no what you called Atkins information. Aiken. Aiken, excuse me. Yes, Your Honor. I thought that the so-called list of your mitigating facts was generated by the defendant and the judge basically gave what the defendant wanted, albeit attached it to the jury form as opposed to including it in the instructions delivered in open court. Do I have that right? Yes, Your Honor. Now, if that's the case, then unless you tried to put in so-called Aiken's factors and the government objected and the district court refused to allow them, the fact that they weren't there was the choice of the defendant, was it not? Your Honor, I think the only reasonable way to read this record is the defendant understood that the judge was very intent on making clear this is not to be considered. The idea that there's this testimony here and it's fair game, given its importance the idea that the defense counsel would have ignored it I think is pretty far-fetched. The other thing I wanted to talk about was Mr. Bull says, well, we didn't raise personal danger, and I addressed that. They did. They implied it. They alleged it. He said our argument was vicarious danger, that he could recruit, he could manipulate, and here's what the judge said about that. And this basis they're defending, Your Honor, Judge Rogers, you asked when this came up. This came up the day after summations in an order. This never gets mentioned while Aiken and Cunningham are in the stand. The judge says appropriate rebuttal to the government's evidence in this case would be information that it would be impossible for a defendant to ever communicate with anyone outside of prison for the rest of his life or that he would not be able to influence other inmates while in prison. I think Judge White really hit the nail on the head here, which is this impossibility test the judge applied was a glaring legal error. That's clearly not what the law holds on the defendant's right to rebut future dangerousness. Skipper makes that clear, and it's really obvious. This is a probabilistic issue. Nobody can prove 100% risk, and nobody can prove a 0% risk. But what you had the government saying here is there's a pretty darn high risk. They portrayed him as a wolf, a Mr. Hyde knocking at the door. They said this is like self-defense. You've got to protect the wolves. You've got to protect the sheep. They portrayed the risk as quite high. And so if the defense witnesses had been able to present their evidence, and again the government is not questioning, didn't question their qualifications in their brief, didn't question that they were reliable. If the jurors had accepted that testimony and said, well, we don't think there's 0 risk, but maybe it's 1% or 5% because these experts would have addressed that. They specifically said, look, given this guy's lack of gang connections and his facial features and his build, he's going to be victimized. He's not going to be manipulating anyone. He's going to have to go into protective custody. They talked about the communications restrictions. They said there's a continuous envelope, a 24-7 envelope around visitation, around telephone contacts, around mail, which, again, is quite at odds with what was going on in the jail. And all the jurors had to base their decision on about is this guy going to be violent in prison is, well, what was he able to do in the jail? So you have a situation where it's not that the jury just didn't get to hear the other side of the story. They were really misled. When the government said prison walls can't contain him, that's something that the defense witnesses would have specifically been able to address. Just on the group questioning, very briefly, this court has been clear in Goins and Corrado, that group questioning is not sufficient. This court has never affirmed a case where you've had group questioning. And the group questioning here was particularly problematic. The judge puts the jurors all in the boxes. We're starting the sentencing hearing, and then starts asking group questions. If this four-person is afraid of the defendant, that's going to deter her. Number one, this is two weeks later. The questions are vague. They're not specific. Most of them are phrased in terms of, did you understand? And the jurors are asked to nod. There's a reason we don't poll a jury with nodding. I don't know how you can tell that 18 people are nodding. So I don't think the group question here does it, and the individual questioning, the judge just never asks her anything about the effect. Would you address the argument that Cunningham's testimony was not sufficiently particularized? I will, and I think what Cunningham said was a couple of things. He said, look at the rates of violence by capital offenders, and it shows you how effective BOP security is. So in addition to laying out the security measures, he's saying it's effective. Now, the point of this for a juror isn't, I'm going to give Rajon Taylor a life sentence because other inmates aren't going to be violent. And that's what district courts in cases like Wilson and Uman have specifically said. They said, even though Cunningham's testimony about the effectiveness of BOP security and violence rates is general, it's applicable to the defendant. Because Cunningham was saying, here are all the security measures you heard about. Here's how effective they are. And the other part of his testimony that was critical is he said, the factors the government's relying on to say he's going to be dangerous, his prior murder, his record of identity theft, the fact he's doing life, empirically those don't predict dangerousness. That's a matter of science. So that testimony really had individual applicability, as all the other courts that have admitted him in cases over government injection, including in this circuit in Gabrion, have said. The court has no further questions. Thank you. Thank you, counsel. We appreciate your arguments. We appreciate the briefing. I want to especially commend Mr. Fisher, Ms. Gorey, Ms. Schenck on briefing an argument that was focused. I know it's possible to raise 50 issues if you want, and raising 14 and then two at oral argument helps us to focus on the issues that are most important. So we appreciate the advocacy of both sides and the case that was submitted.